The opinion of the Court was delivered by
Johnston, Ch.
We agree with the Chancellor in relation to the application of the statute 22 and 23 Charles 2, ch. 10, (a) to this case.
This statute, which was made of force by our statute of 1712, makes it the duty of the ordinary, in granting administration of intestates’ estates, to take sufficient bond, “ with two or more able *481 sureties, — respect being had to the value of the estate.” It constituted the law on the subject at the passage of our statute of 1789. (b) This latter statute requires that “every administrator shall enter into bond, with good security, to be approved by the Court, in a sum equal to the full value of the estate.”
These two statutes are to be construed together. There are no express terms in the latter repealing the former; therefore, if repealed, it must be by implication. The doctrine of repeal by implication is not favored in law. (c) Where repeal arises by implication, the implication must be necessary, and arise from incompatibility or incongruity, more or less, between the provisions of the new law and the old. But there is no repugnance between them in this instance.
The true interpretation of the statute of 1789, in connection with the statute of Charles, is, that when the former requires bond, “ with good security,” it means that security which the latter required and made good, — to wit, the security of two ‘‘ able sureties, — respect being had to the value of the estate.”
If this interpretation of our statute law were doubtful, we should feel inclined to adopt it, from its conformity to the practical construction which, we believe, has uniformly been put upon the Act of 1789, from the time of its enactment. We believe, in every ordinary’s office in the State, the rule is, to require at least two sureties to administration bonds.
In our view, the responsibility of the administrator himself does not enter into the consideration of the sufficiency of the bond. The creditors and distributees of the estate never needed Ms bond to make him responsible. He was responsible without it. The security, which the law intended to give them, was additional to his. This will be more clearly seen, when it is considered that the legislature had established a’rule, regulating the right to claim administration, irrespective of the responsibility of the person upon whom this right devolved. The person entitled to administer, must have letters granted to him upon *482 the sole condition, that he give suitable sureties ; and this shows that the ability of the sureties was alone looked to by the legislature.
We have thus, ascertained the duty of the ordinary. He must take bond, with at least two able sureties. He was not to inquire whether the bond was good, reference being had to the solvency of the administrator. The inquiry was not, whether compounding the -responsibility of all the parties to it, it was sufficient. He must look to the sureties alone. If they were “ able ” to respond for the estate, the “ security ” was good ; otherwise, it was not such as he was required to take. Nor was his duty performed, unless he took two such sureties. If he had taken a bond, with one surety only — however able that one might be to answer for the value of the estate, — this would have been no compliance with the statute. He must take another. Nor would it have been a substantial compliance, if having taken one able surety, he had accepted a man of straw for the second. It would have been a mere evasion of duty. The second surety must be able — respect being had to the value of the estate — as well as the first. Each surety must be “ able,” and “able” with reference to the estate to be secured.* That is the standard by' which the statute requires the ability of a surety to be measured.
It seems hardly necessary to observe, that the ability to which the statute refers, is a pecuniary, or property, ability. It has no *483 reference to the intelligence, industry, or activity of the party; by which he may repair an embarrassed estate, or acquire property. But it refers to the apparent means, or property, possessed by the party, to which resort may be had to repair the loss, if the estate should be wasted.
The duty of the ordinary was, to have taken such a bond as we have described. It was a duty imposed on him by law, and which, when he accepted office, he undertook to perform. In his performance of it, he was not under the control of the parties interested in the estate. It seems to be just that an officer, to whom the law has comitted the care of estates, belonging, in many instances, to helpless parties — (widows and infants; — ) whose conduct is beyond their control or interference, and who possesses an ample, almost a capricious, power to reject any security, the sufficiency of which he may doubt or suspect,— should be held to a strict account for any neglect in taking security, by which they have sustained loss.
A question has been presented, whether the ordinary, in taking bond in this instance, acted judicially or ministerially. The question is important; because, if the act was judicial, he is not responsible for error in its performance. It is otherwise, if the act was ministerial.
We think the Chancellor was right in regarding the act of the ordinary as mitiisterial.
A judicial act generally intends the decision of some question of law, falling within the jurisdiction of the forum, in which the question arises between parties. There may be cases in which the decision may be judicial, although there be no litigation, and, of course, no parties; but, even then, the decision must, generally, involve some question or point of law.
The mere circumstance, that an official act demands, on the part of the officer, the exercise of discretion, vigilance, circumspection or prudence, is not sufficient to make it a judicial act. Many acts, clearly recognized in law as ministerial, require the exercise of these qualities ; as, for instance, of a sheriff making levies, taking bail, &c.
*484 If the ordinary had not determined, in this instance, to take two sureties, it might, possibly, have been supposed that he had gone into an inquiry, whether it was his duty to do so ; and, in the course of that inquiry, had_ determined that the statute of Charles was no longer of force, and that the whole of his duty was to be gathered from the Act of 1789. This might, possibly, have been regarded as a judicial error, for which he was not responsible. But the taking of two sureties shows that, if that question arose in his mind, he decided it correctly; and that the only error he committed was in accepting two insufficient sureties.
According to the principles of many decisions in this State, (d) ordinaries, in granting administration and taking bond, act ministerially; and they have been held liable for omitting to take bonds, for not taking them at the right time, or of the proper form, or for taking them with inadequate surety. This, together with the fact that ordinaries are to give bond, (e) on which they are amenable, (f) andaré expressly made liable by the 21st section of the Act of 1789, (g) for omission to take administration bonds, 'as required by law, — shows, we think, that the legislature, especially in the last instanee, did not contemplate the duty in question as judicial.
But viewing the act of the ordinary, in the case before us, as ministerial, and not judicial, the plaintiffs’ counsel have properly conceded, that if the loss, which has been sustained, has not resulted from negligence on his part, but has arisen from causes which, acting faithfully, he could not foresee or control — he is not amenable, especially in this Court. Indeed, according to my recollection, such was the doctrine held at law, in a case brought by the distributees of Cates against Cureton, Ordinary of Newberry, and decided in the Appeal Court, about 1826 ; which decision cannot now be found in the Clerk’s office.
*485 This is, substantially, the doctrine of the Chancellor in this case; and we are satisfied with it. He announces the position, that the measure of a public officer’s duty is, the exercise of that degree of prudence and diligence, which a discreet individual would employ about his private affairs of the same nature. If an officer, after the exercise of that degree of discretion, should, from unforeseen causes, fail to attain the end attempted by him, he is excusable.
If the evidence adduced at the hearing had been directed to this point, and the Chancellor had concluded from that evidence that the defendant had come up to this rule, we should not have disturbed his decree ; for we desire to adhere to the rule of this Court, which is, that a Chancellor’s conclusion upon matters of fact is to be respected, like the verdict of a jury; and not to be set aside, unless for gross error. We shall recur to this point hereafter.
Let us now proceed to the evidence in this case.
The fact is incontestibly made out, that, at the date of the bond, neither of the sureties taken, nor both together, nor the .two with the aid of their principal, were of sufficient means to answer for the estate. Though their insufficiency was developed by subsequent events, it really existed at the time.
But, to confine ourselves to the two sureties to the bond,— which is the true view, — it is certain, that John L. McRae, one of them, never had property equivalent to the estate which he undertook to insure. 'No witness ventured to value his ostensible means beyond $2,000 or $2,500; and the weight of evidence was much lower. The land of the other, (Henegan,) had been sold out; and with executions against him, amounting really to about $12,000, but apparently to near $19,000, he had but nineteen negroes, (with some inconsiderable property besides,) to answer these judgment debts.
These were the circumstances under which the bond was taken. Do they not show that, in fact, the sureties were— neither of them — able, in the sense of the statute, for their un *486 dertaking ? And that the bond which the ordinary took was not, in fact, such a bond as the legislature required him to take 1
Now, admitting that the ordinary is allowed to show an excuse for his failure, we conceive that the excuse is not to be presumed.
If, in a collateral proceeding, there was a deficiency of proof that a bond had been taken, we might presume that the officer had done his duty, and infer that one was taken. But even in that case, if it were proved that there never was a bond, we could neither presume the performance of official duty nor the existence of a bond. And in this case, if there was no proof of the inability of the sureties, we should presume their ability, and discard the imputation of official neglect. . .
But when the fact is made out, that the sureties taken by the ordinary were not “ able,” the plaintiffs are not bound to go on, and prove that the ordinary had no justifiable reason for taking them. (h) When a default is proved on him the burden of proof shifts, and he must show his excuse : — in analogy to the criminal law, which, though it presumes every man innocent of crime, yet, if a homicide be proved on an accused person, will hold him guilty of murder, unless he extenuates the offence by evidence-
After the proof made by the plaintiffs in this case, the burden of proof was upon the ordinary, to show that the bond — shown to be insufficient — was taken by him under circumstances which would have imposed a belief, on men of circumspection and prudence, that it was of the character which the law required : that though the sureties were not “ able,” they appeared to be so ; that they had the appearance of ability, — and that he was deceived.
His proof was not directed to this point; and has signally failed of making out a defence. The ordinary himself has not, in his answer, pretended to aver, that either of the sureties *487 was, or that he at the time believed either of them to be, possessed of property equal to the value of the estate. Nor has any witness said that they had, or appeared to have, properly of that value.
The proper question was not, whether the bond, by the compound ability of all the obligors, was good. That was not the character of the bond which the ordinary was to take. The law was that the sureties were, severally, to be of ability to pay the amount of the estate : and the question was, whether they exhibited substantial appearances of such ability.
This inquiry was not solved by witnesses saying, that they would have taken the bond for that amount. In the first place, the prudence of the ordinary’s taking the bond was not to be left to the opinion of witnesses. It was a matter to be inferred by the Court, upon the evidence of facts. In the next place, it is manifest that the opinion of the witnesses proceeded upon a principle different from that which the exigency of the case required. They supposed that the prudence of taking the bond depended upon the sufficiency of all the obligors together. Viewed in that light, it might be prudent to take it. But the law required a bond, good in reference to each of the sureties; and it was not prudent to take one which did not promise to come up to this standard. No witness was found who proved that he would have taken this bond, if his object had been, — or if he had been required, — to take one of the character described. Therefore, though the position be true, that the ordinary might stand excused, if he exercised the prudence of ordinary men, in similar circumstances ; the proof adduced does not apply to persons in similar circumstances, but to others acting under a different rule of conduct, and by no means makes out the de-fence required in the case.
Most of the witnesses, who said they would have taken the bond, appear to have been imperfectly acquainted with the property and indebtedness of the sureties. Not one of them says that John L. McRae appeared to be “ able ” to make good the estate. Those who appeared best acquainted with Henegan, *488 relied, for their opinion, more on his capacity than his property.
But, in opposition to the opinion of the whole of them, is the declaration of the defendant to Weatherly, that, in taking the bond, he relied more on Colin McRea, the administrator, than on the sureties — which shows that he deemed it unnecessary to make the investigation which his duty required, or, if he did, that he was left in doubt as to the condition of the latter; and (contrary to his duty)' risked the bond on the means of the principal.
Besides, it is not to be forgotten, that the condition of Hénegan was one which the defendant was bound to notice. Overwhelming judgments existed on record against him, and his remaining property was levied on, and advertised on the door of the very Court House in which the ordinary’s office was. Did not this oblige him at least to inquire ? and has he produced a single witness to prove that he ever did so ? or has he proved that he ever had a favorable representation of the means of this surety, or of his co-surety, from any person whomsoever ?
On the whole, we are of opinion, that the decree, so far as it exonerates the defendant from accountability for the assets which came to the hands of Colin McRae, was erroneous, and should be reversed : and it is so ordered : and it is adjudged that he is accountable for the same.
We are of opinion, that the objection to the exercise of jurisdiction, taken in the pleadings, is obviated by the fact, that it was waived at the hearing, and has not been insisted on here. Were it otherwise, it is not clear that it could prevail.
Certainly, the plaintiffs have a right to claim an account of so much of the estate as came to the hands of the defendant. This gives jurisdiction to the Court: and, when complete justice requires it to go on, it may dispose of the whole case.
Not only so, but the plaintiffs have a right to an account of the assets which came to the hands of Colin McRea: and, for that purpose, may bring in all persons who have made them *489 selves answerable for his administration of them. 'The defendant, as we have adjudged, has made himself thus answerable. It may be, however, that he stands as surety for the parties to the administration bond: and it is left to the consideration of the plaintiffs, whether they will venture to ask a final decree, until they have brought in the sureties, or their representatives. It would seem proper to bring them in.
In closing this judgment, it may be proper to observe further, on the subject of jurisdiction, that a ground of jurisdiction exists in preventing a multiplicity and circuity of suits.
It is ordered, that the Circuit decree' be modified, according to this judgment, and that the cause be remanded to the Circuit Court.
Dunkin and WaRdlaw, CC., concurred.

Decree modified.

 2 Stat. 523.

5 Stat. 110.

 State vs. Woodside, 9 Ired. 496; Bruce vs. Schuyler, 4 Gilman, 4.

hToTE by Chancellor Johnston. — Sino© the delivery of this opinion, I have reconsidered this point, and find some reason to doubt whether a proper construction of the statute of Charles demands an ability in each surety equal to the value of the estate to be administered. In advancing the opinion I did, I understood to myself to bo expressing the views of my brethren, in which I, at the time, concurred. Perhaps it would have been better to have abstained, altogether, from expressing any opinion on this point of the case. There was no necessity for it. Independently of any such construction, the result attained by the Court of Appeals was inevitable: for even supposing that, by proper construction of the statute, it was sufficient that one of the sureties, or both of them together, should be of ability to make good the estato ; the proof in this case was, that neither of them, nor the two combined, possessed such ability: and the ordinary had no reason to suppose — from appearances presented to him, or from any representations mado to him, upon inquiry, — that either of them, or both together, were able to indemnify parties interested for the loss of the estate.

 Simmons vs. Watson, 2 Sp. 97; Boggs vs. Hamilton, 2 Mill, 382; Somerall vs. Gibbes, 4 McC. 547; State vs. Patterson, 1 Strob. 35; Treasurers vs. Clowney, 2 McM. 510.

 11 Stat. 39.

 6 Stat. 384.

 5 Stat. 110.

It) Sparhawk vs. Bartlett, 2 Mass. R. 198.